

P E N T E C H
PHARMACEUTICALS, INC.

3315 Algonquin Road

Suite 310

Rolling Meadows, IL 6000{

Phone 847.255.0303

Fax 847.255.2112

January 8, 2007

*SENT VIA FEDERAL EXPRESS*

Genzyme Corporation
Attention: Henri A. Termeer, President, Chairman & CEO
500 Kendall Street
Cambridge, MA  02142

Genzyme Corporation
(formerly Bone Care International, Inc.)
1600 Aspen Commons
Middleton, WI 53562

Re:    **Certification of Non-Infringement and/or Invalidity of**
       **United States Patent Nos. 5,602,116; 5,707,980; and 6,903,083**

To Whom it May Concern:

Pursuant to Section 505(j)(2)(B)(i) and (ii) of the Federal Food, Drug and Cosmetic Act ("the Act"), notice is hereby given that the Food and Drug Administration ("FDA") has received an Abbreviated New Drug Application ("ANDA") submitted by Pentech Pharmaceuticals, Inc. ("Pentech"). Pentech has filed a biowaiver with the ANDA.

Furthermore, the following information is herein provided:

1.     The ANDA number is 90-040.

2.     The established name of the proposed drug product that is the subject of Pentech's ANDA is Doxercaliferol ("Pentech's ANDA product"). Genzyme Corporation markets Doxercaliferol under the brand name Hectorol®.

3.     The active ingredient, strength and dosage form of the product is Doxercaliferol, 2µg/mL.

104568_1

4.      The ANDA contains a certification pursuant to Section 505(j)(2)(A)(vii)(IV) of the Act ("Paragraph IV Certification") to obtain approval to engage in the commercial manufacture, use, or sale of Pentech's ANDA product before the expiration of U.S. Patent Nos. 5,602,116 ("the '116 patent"), 5,707,980 ("the '980 patent") and U.S. Patent No. 6,903,083 ("the '083 patent"). These patents were listed in the Orange Book for New Drug Application No. 021027 for Hectorol®.

5.      As stated in the Paragraph IV Patent Certifications, the claims of the '116, '980, and '083 patents are invalid, unenforceable and/or will not be infringed by the manufacture, use or sale of Pentech's ANDA product.

Below is a detailed statement of the factual and legal bases of Pentech's patent certification regarding the invalidity, unenforceability and/or non-infringement of the claims of the '116, '980 and '083 patents. This information is supplied for the sole purpose of complying with the applicable statutes and neither Pentech nor its attorneys waive any attorney-client privilege or attorney work product immunity concerning the subject matter of this communication. This notice letter also includes an Offer of Confidential Access to Application.

### Pentech' ANDA Product

Each milliliter (mL) of solution in Pentech's ANDA product contains doxercaliferol; Polysorbate 20, sodium chloride; sodium ascorbate; sodium phosphate, dibaric; sodium phosphate; monobasic; and disodium edetate. The purity of Pentech's ANDA product was determined by using a weight-based HPLC assay. This analysis showed that Pentech's ANDA product contains at least one impurity which is greater than 0.5%.

Other names frequently used for doxercalciferol in Pentech's ANDA product are $1\alpha$-hydroxyvitamin $D_2$, $1\alpha$-OH-$D_2$ and $1\alpha$-hydroxyergocalciferol.

### The '116 Patent Claims and Prosecution History

The '116 patent issued on February 11, 1997 with 9 claims. The application for the '116 patent was filed on April 3, 1995 and was a continuation in part of application Serial No. 08/119,895, now U.S. Patent No. 5,403,831, which was a continuation of application Serial No. 07/812,056, now abandoned, which was a continuation of application Serial No. 07/569,412, now U.S. Patent No. 5,104,864, which was a continuation of application Serial No. 07/227,371, now abandoned. The '116 patent expires on February 11, 2014.

The '116 patent is the first application in a series of patents for treating hyperparathyroidism that were once assigned to Bone Care International. Specifically, the '116 patent concerns a method for treating or preventing hyperparathyroidism secondary to end-stage renal disease by lowering (or maintaining low) serum parathyroid hormone (also referred to herein as "PTH") levels.

The '116 patent has 2 independent claims (*i.e.*, claims 1 and 9) and 7 dependent claims. Claims 2, 4, and 5 depend directly from claim 1.   Claims 3, 6, 7 and 8 depend indirectly from claim 1.

Claim 1 of the '116 patent is as follows:

1.    A method for lowering or maintaining lowered serum parathyroid hormone in human patients suffering from hyperparathyroidism secondary to end stage renal disease, comprising:  administering to said patients an effective amount of a vitamin D analog to lower and maintain lowered serum parathyroid hormone levels, said analog comprising formula (I):



wherein B and C are either hydrogen or a carbon-carbon double bond between $C_{22}$ and $C_{23}$; and $R_1$ is hydrogen or hydroxyl provided that when B and C are a double bond, $R_1$ is hydrogen.

Claim 9 of the '116 patent is as follows:

9.    A method of treating a human to alleviate or prevent the pathological effects of hyperparathyroidism secondary to end stage renal disease, wherein the method comprises administering orally to said human, in need thereof, a vitamin D analog selected from the group consisting of $1\alpha$-OH-vitamin $D_2$; $1\alpha$-OH-vitamin $D_4$; and $1\alpha,24(R)$-$(OH)_2$-vitamin $D_4$ wherein said compound is administered to said human in an amount sufficient to lower serum parathyroid hormone levels as measured by blood serum level of parathyroid hormone over time after ingestion in said human to thereby alleviate or prevent said effects.

3

Claims 1 and 9 of the '116 patent do not include vitamin $D_3$.[1]

The limitation that $R_1$ not be a hydroxyl ("OH") when B and C are a double bond was introduced to avoid Nishii, U.S. Patent No. 5,063,221, issued on November 5, 1991 ("Nishii"). $1\alpha$-OH-$D_2$ is specifically included in claim 2, and claim 7 is limited to $1\alpha$-OH-$D_2$. Claim 9 is similar to claim 1, but requires oral administration.

Nishii was discussed in an interview with the examiner, resulting in a Preliminary Amendment to require the above limitation. A Notice of Allowance followed. Nishii recognized that certain Vitamin D analogs can suppress PTH secretion while only weakly affecting calcium serum levels. The compounds claimed by Nishii for treatment of hyperparathyroidism are of the formula:



wherein R is defined as a "branched alkyl group having 4-6 carbon atoms that is substituted by one or two hydroxyl groups or a cyclopropylhydroxymethyl group." Thus, absent the requirement that $R_1$ be hydrogen ("H") when B and C represent a double bond, the compounds included in the claim fall within the scope of the Nishii disclosure.

---

[1]    Vitamin $D_3$ has the following formula:

104568_1

## The '980 Patent Claims and Prosecution History

The '980 patent issued on January 13, 1998 with 11 claims. The application for the '980 patent was filed on February 11, 1997 and was a continuation of application Serial No. 08/415,488, now U.S. Patent No. 5,602,116; which was a continuation-in-part of application Serial No. 08/119,895, now U.S. Patent No. 5,403,831 which was a continuation of application Serial No. 07/812,056, now abandoned, which was a continuation of application Serial No.07/569,412, now U.S. Patent No. 5,104,864, which was a continuation of application Serial No. 07/227,371, now abandoned. The '980 patent expires on August 17, 2010.

The '980 patent has 3 independent claims (*i.e.,* claims 1, 9, 10) and 8 dependent claims. Claims 2, 3, 4, 6, 7 and 8 depend directly from claim 1. Claim 5 depends indirectly from claim 1. Claim 11 depends directly from claim 10.

Claim 1 of the '980 patent is as follows:

1.    A method for lowering or maintaining lowered serum parathyroid hormone in human patients suffering from hyperparathyroidism secondary to end stage renal disease, comprising administering to said patients an effective amount of a vitamin D analog which is $1\alpha,25$-dihydroxyvitamin $D_4$, to lower and maintain lowered serum parathyroid hormone levels.

Claim 9 of the '980 patent is as follows:

9.    A method of treating a human to alleviate or prevent the pathological effects of hyperparathyroidism secondary to end stage renal disease, wherein the method comprises administering orally to said human, in need thereof, a vitamin D analog which is $1\alpha,25$-$(OH)_2$-vitamin $D_4$ wherein said compound is administered to said human in an amount sufficient to lower serum parathyroid hormone levels as measured by blood serum level of parathyroid hormone over time after ingestion in said human to thereby alleviate or prevent said effects.

Claim 10 of the '980 patent is as follows:

10.   A method for lowering or maintaining lowered serum parathyroid hormone in human patients suffering from hyperparathyroidism secondary to end stage renal disease, comprising: administering to said patients an effective amount of a vitamin D analog to lower and maintain lowered serum parathyroid hormone levels, said analog comprising formula (I):

104568_1

wherein $A^1$ and $A^2$ are either hydrogen or a carbon-carbon double bond between C-22 and C-23; and $R^1$ is hydrogen or hydroxyl provided that when $A^1$ and $A^2$ are a double bond, $R^1$ is hydrogen, and wherein said analog is administered in combination with at least one agent characterized by said agent's ability to reduce loss of bone mass or bond mineral content in the patients.

Of the 11 claims that issued in the '980 patent, claims 1-9 are limited to a vitamin $D_4$ analog. Since Pentech's ANDA product is a vitamin $D_2$ analog, claims 1-9 are not relevant. Only claims 10 and 11 are germane. Claims 10 and 11 require co-administration of a second agent along with the vitamin D analog of the structure set forth above.

There is essentially no prosecution in this case. Most of the claims were added by a Preliminary Amendment, and a Notice of Allowance followed immediately.

### The '083 Patent Claims and Prosecution History

The '083 patent issued on June 7, 2005 with 19 claims. The application for the '083 patent was filed on August 20, 2003 and was a continuation-in-part of International Application No. PCT/US01/22729, which claimed priority benefit of U.S. provisional patent application Serial No. 60/219,068 filed July 18, 2000. The '083 patent expires on July 18, 2021.

The '083 patent contains 1 independent claim (*i.e.,* claim 1) and 18 dependent claims. Claims 2, 7, 14 and 19 depend directly from claim 1 and claims 3-6, 8-13 and 15-18 depend indirectly from claim 1.

Claim 1 of the '083 patent reads as follows:

1.    A stabilized $1\alpha$-hydroxyvitamin $D_2$ characterized by a purity equal to or greater than 98% by a weight-based HPLC assay, residual solvents of 0.5% or less, a total impurity of 1.5% or less, and no single impurity of greater than 0.5%.

During the prosecution of the application that matured into the '083 patent, applicants made amendments *narrowing* the scope of the claims in order to avoid the cited patents. In particular, the original claims were directed to a stabilized 1α-hydroxyvitamin D. The broadest claims were rejected as being anticipated by U.S. Patent Nos. 6,432,936 and 4,554,106 to DeLuca *et al.*, as well as U.S. Patent No. 5,472,957 to Hesse *et al.*

In response, the applicants repeatedly argued that the references did not disclose all of the limitation of the claims, and repeatedly quoted the limitations on purity, residual solvent level, and presence of no single impurity of greater than 0.5%. (*See* 9/17/04 Amendment[2] at pp. 9-14.) With respect to U.S. Patent No. 6,432,936 ("the '936 patent"), applicants emphasized that the '936 patent "fails to disclose any of the purity parameters of the claimed 1α-hydroxyvitamin D₂, let alone all of them." (*Id.* at p.13, fifth full paragraph, emphasis added). Thus, to overcome the anticipation rejections, applicants specifically asserted that the invention was embodied in the entire combination of purity and impurity limitations. Applicants ultimately overcame the rejection based on the '936 patent by these arguments. These arguments represent a clear disavowal of subject matter outside the specific limitations of the claims.

The claims were also rejected as obvious over a combination of the above-described references. As evidence of secondary considerations mitigating against a finding of obviousness, Dr. Knutson, one of the inventors, submitted a Declaration under 37 CFR § 1.132. This Declaration indicates that the high level of purity set forth in the claims leads to the unexpectedly improved stability for 1α-hydroxyvitamin D₂ (*see Id.* at pp. 18 and 19, which includes excerpts from the Declaration). Based on the Declaration, applicants argued that the enhanced stability of the claimed product was specifically tied to its overall high purity and freedom from impurities of the claimed product, and that the references do not disclose all of the limitations of the claims (*Id.* at pp. 18-19, particularly the last paragraph of p. 19). In order for secondary considerations, such as unexpected results, to overcome a *prima facie* finding of obviousness, the secondary considerations must be directly tied to the claim limitation at issue (*i.e.*, there must be a nexus). *See In re Huang*, 100 F.3d 135, 139-40 (Fed. Cir. 1996); *In re Paulsen*, 30 F.3d 1475, 1482 (Fed. Cir. 1994). *See also In re GPAC*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). The evidence for unexpected results should be ascertained for an embodiment to reasonably commensurate with the scope of the claims. *See, e.g., In re Lindner*, 457 F.2d 506, 508 (CCPA 1972). Thus, the presentation of the Declaration as evidence of non-obviousness also represents an estoppel or disavowal of compositions that do not meet <u>all</u> the limitations of the claims, since it was this specific combination of purity limitations that was asserted to be responsible for the purported unexpected stability.

<u>Claim Construction</u>

In order to assess the validity or infringement of the claims, the claims must first be construed (*i.e.*, interpreted) to determine their meaning and scope. A patent claim defines the exact boundaries of the invention so that others will know to what the patentee was given exclusive right and will be able to avoid infringing. *See Bell & Howell Document Mgmt.*

---

2    "9/17/04 Amendment" refers to the Amendment under 37 CFR § 1.111 filed on September 17, 2004 from the prosecution history of the '083 patent.

*Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997); *Johnson & Johnston Assocs. v. R.E. Servo Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (*en banc*). If any claim is determined to include the accused device or process within its scope of coverage, then the accused device or process infringes the patent.

"[I]t is fundamental that claims are to be construed in the light of the specification and both are to be read with a view to ascertaining the invention." *United States v. Adams*, 383 U.S. 39, 49 (1966) citing, *inter alia, Seymour v. Osborne*, 11 Wall, 516, 547 (1871).

Claim construction is a question of law exclusively for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370 (1996). In most circumstances, the intrinsic evidence - the language of the claims, the specification, and the prosecution history - will provide sufficient information for construing the term. *Vitronics Corp. v. Conceptronic, Inc.* 90 F.3d 1576, 1583 (Fed. Cir. 1996). However, the analysis must begin with the language of the claims. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). In analyzing claim language, words of the claim are to be given their ordinary and customary meaning unless a special definition is chosen and plainly stated in the patent. *Id.* at 1582. *See also Kraft foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1366 (Fed. Cir. 2000).

The Court may rely on extrinsic evidence, such as dictionaries, learned treatises, and expert testimony, for limited purposes, such as to inform the understanding of how ambiguous terms in the patent are understood by those in the field, but the Court may not rely on extrinsic evidence to vary or contradict the terms of the claims.

The Court of Appeals for the Federal Circuit ("Federal Circuit") explained in *Glaxo Group v. Apotex*, 376 F.3d 1339, 1346 (Fed. Cir. 2004):

> To properly construe a claim term, a court first considers the intrinsic evidence, starting with the language of the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Claim terms should be construed consistently with their ordinary and customary meanings, as determined by those of ordinary skill in the art. *Brookhill-Wilk I, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003). In construing the terms of a patent, the court must also examine the specification to determine whether the patentee used the claim term consistent with its ordinary meaning or acted as his own lexicographer in defining the term. *See, e.g., Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1988); *Brookhill-Wilk*, 334 F.3d at 1299.

## Burden of Proof

The patent owner has the burden of proving infringement by a preponderance of the evidence, *i.e.*, the burden of proving that it is more likely than not that the patent is infringed.

*Conroy v. Reebok Int'l Ltd.,* 14 F.3d 1570, 1573 (Fed. Cir. 1994).

The invalidity of a patent claim is a defense to infringement. 35 U.S.C. §282. Each claim of an issued U.S. patent is independently presumed to be valid. *Id.* To overcome the statutory presumption of validity with respect to any claim, the invalidity of a patent claim must be established by clear and convincing evidence. *RCA Corp. v. Applied Digital Sys., Inc.,* 730 F.2d 1440 (Fed. Cir. 1984).

**Direct Infringement**
**– Literal Infringement and Infringement Under the Doctrine of Equivalents –**

Whoever, without authority, makes, uses, offers to sell, or sells any patented invention within the United States, or imports into the United States any patented invention during the term of the patent therefore, infringes the patent. 35 U.S.C.§271(a). Exceptions to this rule are recited in 35 U.S.C. §271, as well as in 35 U.S.C. §§272 and 273.

A determination of patent infringement is a two-step analysis. *Markman,* 52 F.3d at 976. First, a claim must be interpreted to determine its proper scope and meaning. *Id.* Second, it must be determined whether an accused device or process is within the scope of the properly interpreted claim. *Id.*

Direct infringement may be either literal or under the "doctrine of equivalents." If the accused product or process meets every limitation of a claim, then literal infringement is established. *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed. Cir. 1985). In determining literal infringement, each limitation is considered material and essential, and every limitation of a patent claim must be found in the accused product or process. *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1507, 1575 (Fed. Cir. 1995).

A patent claim that does not literally encompass an accused product or process may nonetheless encompass the product or process under the doctrine of equivalents. Infringement of a patent claim under the doctrine of equivalents requires that the accused product or process posses an "equivalent" of each element of the claim that is not literally embodied in the accused product or process. To be considered an "equivalent", the element in the accused product or process must differ only "insubstantially" from an element recited in the patent claim at issue. *See, e.g., Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17 (1997). Whether a claim element and the element of an accused product or process are "equivalent" typically is assessed by analyzing whether the alleged element of the accused product or process performs the same function, in the same way, to achieve the same result, as the purportedly "equivalent" claim element.

The doctrine of equivalents is an equitable doctrine; therefore, its application is the exception, not the rule. *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed. Cir. 1991). As the Federal Circuit has cautioned, "if the public comes to believe (or fear) that the language of the patent claims can never be relied on, and that the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose." *Id.*

9

The applicability of the doctrine of equivalents also is limited by prosecution history estoppel. Prosecution history estoppel prevents a patentee from recapturing through the application of the doctrine of equivalents claim coverage which was given up during prosecution, if the reason for such surrender of claim coverage is to comply with any provision of the Patent Act. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 344 F.3d 1359, 1366 (Fed. Cir. 2003) (*en banc*). This restrictive estoppel applies both to amendments which narrowed a claim to overcome rejections based on prior art as well as to arguments submitted to obtain the patent. *Southwall,* 54 F.3d at 1581; *Standard Oil Co. v. American Cyanamid Co.,* 744 F.2d 448, 452 (Fed. Cir. 1985). Both grounds apply in the present case.

The doctrine of equivalents does not permit a patentee to obtain coverage which the patentee could not have obtained lawfully from the United States Patent and Trademark Office ("PTO") by literal claims. *Conroy,* 14 F.3d at 1577. In other words, a claim cannot be construed for purposes of establishing infringement under the doctrine of equivalents if such a claim construction would result in an invalid claim.

Yet another significant limitation on the application of the doctrine of equivalents is the so-called "all elements rule" or "all limitations rule," which provides that the doctrine of equivalents cannot be applied when its application would vitiate or otherwise render meaningless an entire claim limitation. *See Warner-Jenkinson,* 520 U.S. at 29.

A corollary to the all elements rule is the "specific exclusion principle," which states that when a claim limitation specifically excludes the presence of some item, material, or step, then the doctrine of equivalents cannot be used to extend the scope of the claim to cover an accused device or composition that includes the excluded item. *See, e.g., Asyst Technologies Inc. v. Emtrak Inc.,* 402 F.3d 1188 (Fed. Cir. 2005) ("To hold that 'unmounted' is equivalent to 'mounted' would effectively read the 'mounted on' limitation out of the patent ... This case falls within both [the all elements rule] and its corollary, the 'specific exclusion' principle, since the term 'mounted' can fairly be said to exclude objects that are 'unmounted') citing *SciMed Life Sys. v. Advanced Cardiovascular Sys.,* 242 F.3d 1337, 1346 (Fed. Cir. 2000) and *Moore U.S.A., Inc. v. Standard Register Co.,* 229 F.3d 1091, 1106 (Fed Cir. 2000) ("it would defy logic to conclude that a minority - the very antithesis of a majority - could be insubstantially different from a claim limitation requiring a majority, and no reasonable jury could find otherwise"). *See also Cooper Cameron Corp. v. Kvaerner Oilfield Products Inc.,* 291 F.3d 1317 (Fed. Cir. 2002) ("between" excludes "above") and *Zodiac Pool Care Inc. v. Hoffinger Industries Inc.,* 206 F.3d 1408 (Fed. Cir. 2000) ("It defies common usage to suggest that a stop which is 'substantially inward' of an edge could at the same time extend at least to the edge.").

**Indirect Infringement**
**– Inducement of Infringement and Contributory Infringement –**

The active inducement of infringement of a patent and the contributory infringement of a patent are statutorily treated as indirect infringement. Specifically, whoever actively induces infringement of a patent shall be liable as an infringer. 35 U.S.C. §271(b). Moreover, whoever offers to sell or sells in the United States or imports into the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same

10

to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer.  35 U.S.C. § 271(c).

For there to be inducement of infringement or contributory infringement, there must be a direct infringement.  *Porter v. Farmers Supply Services, Inc.,* 790 F.2d 882 (Fed. Cir. 1986). In other words, if there is no direct infringement by someone, there can be no inducement of infringement or contributory infringement.  *Id.*  Furthermore, if a first party is a direct infringer, a second party dealing with the first party cannot be considered an inducer of infringement if the second party does not engage in active steps to induce the infringing activities of the first party. *C.R. Bard, Inc. v. Advanced Cardiovascular Systems,* 911 F.2d 670 (Fed. Cir. 1990). Similarly, if a first party is a direct infringer, a second party dealing with the first party cannot be considered a contributory infringer if the second party is merely supplying a staple article or commodity of commerce with substantial non-infringing use.  *Id.*

**Invalidity**
**− Anticipation, Obviousness and Double Patenting −**

The Court of Appeals for the Federal Circuit has repeatedly emphasized that, notwithstanding the presence of pertinent unconsidered prior art, an issued patent is still presumed valid, and that the burden remains upon the party challenging validity to persuade the Court of a patent's invalidity with clear and convincing evidence.  *See, e.g., American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1358 (Fed. Cir. 1984), *cert. denied,* 469 U.S. 821 (1984); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed. Cir. 1983).

Thus, although the level of proof required to invalidate claims of an issued patent, *i.e.,* the clear and convincing evidence standard, is not altered by virtue of the citation of non-considered prior art, that standard is more easily met by virtue of non-considered prior art that is more pertinent than the prior art that was considered by the examiner during examination of the patent application.  *American Hoist & Derrick,* 725 F.2d at 1359-60; *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1459 (Fed. Cir. 1984).  Hence, the validity of the claims of a patent must be reassessed in view of any newly discovered prior art to determine whether there is clear and convincing evidence of the invalidity of those claims.

If all claimed elements/steps are disclosed, expressly or inherently, in a single prior art reference, that reference is said to "anticipate" the claimed invention, thereby invalidating the claim(s) under 35 U.S.C. §102.  *Scripps Clinic & Research Foundation v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed. Cir. 1991).

When a reference is silent about an asserted inherent characteristic that is necessary for the reference to be anticipatory, such gap in the reference may be filled by recourse to extrinsic evidence.  Such evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill.  Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient. If, however, the disclosure is sufficient to show that the natural result flowing from the operation

11

as taught would result in the performance of the questioned function, the disclosure is sufficient in disclosing that questioned function.   *Continental Can Co. USA Inc. v. Monsanto Co.*, 948 F.2d 1264, 1268-1269 (Fed. Cir. 1991).   *See also Kennecott Corp. v. Kyocera Int'l Inc.*, 835 F.2d 1419, 1422, 1423 (Fed. Cir. 1987), *cert. denied*, 486 U.S. 1008 (1988) (under the doctrine of inherency, the disclosure of a device that inherently performs a function, operates according to a theory, or has an advantage is necessarily a disclosure of that function, theory or advantage, provided the asserted inherent feature is the necessary and only reasonable construction to be given the disclosure by one skilled in the art).

In addition, a reference must contain a disclosure that is "enabling," *i.e.,* sufficient to enable one of ordinary skill in the art to practice the disclosed subject matter.   However, it need not expressly recite every relevant detail.   Every reference relies to some extent upon knowledge of persons skilled in the art to complement that which is disclosed in order to be enabling.   Other references may be relied upon to interpret a reference and to reveal what it would have meant to one of ordinary skill in the art at the time the invention was made.   *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 726 F.2d 724, 726-27 (Fed. Cir. 1984).   Further, where it might be reasonably doubted that a reference is enabling, extrinsic evidence, such as other references, can be relied upon to establish the level of skill in the art.   *In re Donahue*, 766 F.2d 531, 533 (Fed. Cir. 1985); *In re Wiggins*, 488 F.2d 538, 543 (CCPA 1973).

In the absence of a single prior art reference that discloses, expressly or inherently, each and every element of the claimed invention, the issue becomes whether "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. §103.   Resolution of the obviousness issue requires that four factual inquiries be made: (1) the scope and content of the prior art are to be determined; (2) the differences between the prior art and the claims at issue are to be ascertained; (3) the level of ordinary skill in the pertinent art is to be resolved; and (4) objective evidence of secondary considerations such as commercial success, copying, long felt but unsolved needs, failure of others, unexpected results, *etc.,* when present, is to be evaluated. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).   Against this factual background, the obviousness or non-obviousness of the subject matter is determined.   *Id.*

The test is not whether an improvement or a use set forth in a patent would have been obvious or non-obvious; rather, the claimed invention must be considered as a whole.   *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed. Cir. 1990).   It is important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does.   *KSR v Teleflex*, 127 S.Ct. 1727, 1742 (US 2007).   "Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id.* at 1741-42.   The "fact that a combination was obvious to try might show that it was obvious under § 103." *Id.* at 1742.

104568_1

The broad disclosure of a reference is relevant prior art for all it would have suggested to those of ordinary skill in the art. A reference may be relied upon for all that it would have reasonably suggested to one having ordinary skill in the art, including non-preferred embodiments. *Merck & Co. v. Biocraft Lab.*, 874 F.2d 804, 807 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 975 (1989). Disclosed examples and preferred embodiments do not constitute a teaching away from a broader disclosure or non-preferred embodiments. *In re Susi*, 440 F.2d 442, 446 (CCPA 1971). However, the determination of the patentability of claims to a species within a prior art genus is highly fact dependent. Such claims must be analyzed on a case-by-case basis. *See, e.g., In re Baird*, 16 F.3d 380 (Fed. Cir. 1994); *Merck*, 874 F.2d at 804; *In re Susi*, 440 F.2d at 442.

The level of skill in the art is determined entirely with reference to a hypothetical person having ordinary skill in the art. The hypothetical person of ordinary skill is presumed to be aware of all of the pertinent prior art. Relevant factors in determining the level of skill include the educational level of the inventor and active workers in the field, the types of problems encountered in the art, prior art solutions, the rapidity of innovation in the art, and the sophistication of the technology. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

Objective evidence of secondary considerations such as unexpected results, commercial success, long-felt need, failure of others, copying by others, licensing, and skepticism of experts are relevant to the issue of obviousness and must be considered in every case in which they are present. The weight to be accorded to the evidence depends on the individual factual circumstances of each case. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed. Cir. 1983); *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367 (Fed. Cir. 1986), *cert. denied*, 480 U.S. 947 (1987). The ultimate determination on patentability is made on the entire record. *In re Oetiker*, 977 F.2d 1443, 1446 (Fed. Cir. 1992).

In order for secondary considerations evidence to be given substantial weight, the patentee must demonstrate that there is a nexus between such evidence and the claimed invention's merits. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 305 n. 42 (Fed. Cir. 1985), *cert. denied*, 475 U.S. 1017 (1986). The secondary considerations evidence must arise from the patented invention as disclosed and claimed, rather than from extrinsic influences, such as a disclosed but unclaimed feature, *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988), improvements or modifications made by others, *In re Vamco Machine & Tool, Inc.*, 752 F.2d 1564, 1577 n. 5 (Fed. Cir. 1985); prior art features, *Aktiebolaget Karlstads Mekaniska Werkstad v. U.S.I.T.C.*, 705 F.2d 1565, 1577 (Fed. Cir. 1983); or economic and commercial factors unrelated to the technical quality of the patented subject matter. *Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1027 (Fed. Cir. 1985). Although relevant secondary consideration factors must be considered, they do not control the obviousness determination, and must be weighed against the strength of the case for obviousness based on the teachings of the prior art. *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768-69 (Fed. Cir. 1988), *cert. denied*, 493 U.S. 814 (1989). However, as stated by the Court in *Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1574 (Fed. Cir. 1984), *cert. denied*, 471 U.S. 1065 (1985) "it is established that secondary considerations

104568_1

will not support a claim of invention if the subject matter of the patent does not pass the section 103 test of non-obviousness."

The defense of double patenting is based on well established patent law which "precludes one person from obtaining more than one valid patent for either (a) the 'same invention,' or (b) an 'obvious' modification of the same invention." *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985) (affirming a holding of double patenting because the claims at issue were obvious over claims in four prior art patents). Thus, the law against double patenting "prohibit[s] the issuance of the claims in a second patent *not patentably distinct* from the claims of the first patent." *Id.*

The only way to avoid an impermissible extension of a patent term when claims of a patent and a later application (or later patent) are not patentably distinct is to include a terminal disclaimer in the later application (or patent). *In re Schneller*, 397 F.2d 350, 354 (CCPA 1968); *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 940 (Fed. Cir. 1992). Here, a terminal disclaimer is not included with the '980 patent.

The first type of double patenting, based on the same invention, arises from 35 U.S.C. § 101, which authorizes "*a patent*" to issue on an invention. Thus, "same-invention" or statutory double patenting prevents a second patent from issuing on identical subject matter. *Id.* (*citing In re Vogel*, 422 F.2d 438 (CCPA 1970) (emphasis added)). The second type of double patenting, sometimes referred to as obviousness-type double patenting, is a judicially created doctrine grounded in public policy which prevents a patent claim from validly issuing "when the claimed subject matter is not patentably distinct from the subject matter claimed in a commonly owned patent." *In re Berg*, 140 F.3d 1428, 1431 (Fed. Cir. 1998). A later claim is not patentably distinct if it "is obvious over, or anticipated by, the earlier claim." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001).

The prohibition of non-statutory or obviousness-type double patenting applies when a patent and a later application (or later patent) are commonly owned, even if the inventors are not identical. *Eli Lilly*, 251 F.3d at 967-72 (holding claim 7 of U.S. Patent 4,626,549 to Molloy and Schmiegel invalid on the basis of obviousness-type double patenting in view of claim 1 of U.S. Patent 4,590,213 to Stark, where both patents were assigned to Eli Lilly); *see also Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 213 F. Supp. 2d 597, 600 n.7, 603 (E.D. Va. 2002), *aff'd*, 349 F.3d 1373 (Fed. Cir. 2003).

Determination of obviousness-type double patenting entails two-steps:

> First, as a matter of law, a court construes the claim in the earlier patent and the claim in the later patent and determines the differences . . . Second, the court determines whether the differences in subject matter between the two claims render the claims patentably distinct . . . A later claim that is not patentably distinct from an earlier claim in a commonly owned patent is invalid for obvious-type double patenting . . . A later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim.

*Eli Lilly*, 251 F.3d at 968 (footnotes and citations omitted).   "[T]he fundamental reason for the rule [of obviousness-type double patenting] is to prevent unjustified timewise extension of the right to exclude granted by a patent no matter how the extension is brought about." *Eli Lilly*, 251 F.3d at 968 (internal quotations omitted).

## PENTECH'S ANDA PRODUCT DOES NOT INFRINGE THE CLAIMS OF THE '083 AND '980 PATENTS

### There is No Literal Infringement of the '083 Patent Claims

In determining literal infringement, every limitation of the patent claim must be found in the product at issue. *Southwall Technologies, Inc.* v. *Cardinal IG Co.*, 54 F.3d 1507, 1575 (Fed. Cir. 1995). This condition is not met in the present case.

While ordinarily claims must be construed to determine their meaning and scope, *United States v. Adams*, 383 U.S. 39, 49 (1966), no formal claim construction analysis is deemed necessary in this particular case in view of the nature of the claim under consideration.   There are no ambiguities in the claimed formulation.

The claims of the '083 patent expressly recite a necessary minimum purity level and maximum residual solvent and impurity levels for the claimed 1α-hydroxyvitamin $D_2$ in unambiguous terms.   The same minimum purity, residual solvent, and maximum impurity levels are recited in the patent specification at col. 2, lines 45-50.   The purity and impurity levels are specified on a weight basis by HPLC, a generally accepted assay method.

In particular, each claim of the '083 patent specifies that the 1α-hydroxyvitamin $D_2$ be at least 98% pure and contains no single impurity greater than 0.5% on a weight basis by HPLC. At least one of the impurities in Pentech's ANDA product is more than 0.5% measured by a weight-based HPLC assay.   Accordingly, there is no literal infringement of any claim of the '083 patent since the limitation "no single impurity greater than 0.5%" is not met.

### There is No Infringement of the '083 Patent Claims Under the Doctrine of Equivalents

As noted above, Pentech's ANDA product includes at least one impurity which is present in an amount that is greater than 0.5% by a weight-based HPLC. The claims of the '083 patent specifically exclude a 1α-hydroxyvitamin $D_2$ in which any single impurity exceeds 0.5% by a weight-based HPLC.   Accordingly, Pentech's ANDA product does not infringe any claim of the '083 patent under the doctrine of equivalents, because to find infringement would vitiate or effectively read out the "no single impurity greater than 0.5%" limitation of the claims, in violation of the all elements rule and the specific exclusion principle.

In addition, the application of the doctrine of equivalents in this case is limited by prosecution history estoppel, since applicants presented vigorous arguments regarding the unexpected properties resulting from the purity level of the claimed product, as described above. For example, applicants distinguished prior art references by emphasizing that the references did not disclose all features of the claims, and by asserting that the claimed purity level leads to unexpected stability, as described above.

15

As stated earlier for inducement of infringement or contributory infringement, there must also be direct infringement by someone.   Since there is no infringement, either literally or under the doctrine of equivalents, of the '083 patent claims, there is no inducement of or contributory infringement of the '083 patent claim should a third party use Pentech's ANDA product.

### There is No Literal Infringement of the '980 Patent

There is no need for a formal claim construction analysis of the '980 patent claims in view of the nature of the claims under consideration.   Claims 1-9 of the '980 patent require a vitamin $D_4$ analog.   Pentech's ANDA product is a vitamin $D_2$ analog and therefore Pentech's ANDA product does not literally infringe claims 1-9 of the '980 patent.

Claim 10 of the '980 patent requires that the claimed vitamin D analog "is administered in combination with at least one agent characterized by said agent's ability to reduce loss of bone mass or bone mineral content in the patients."   Claim 11 depends from claim 10 and further requires that the "agent" "is selected from the group consisting of other vitamin D compounds, conjugated estrogens, sodium fluorides, biphosphonates, cobalamin, pertussin toxin and boron." Pentech's ANDA product does not include such an "agent" and therefore does not literally infringe the remaining claims 10-11 of the '980 patent.

### There is No Infringement of the '980 Patent Claims Under the Doctrine of Equivalents

There is likewise no infringement of claims 1-9 of the '980 patent under the doctrine of equivalents because the vitamin $D_2$ analog in Pentech's ANDA product is not equivalent to the vitamin $D_4$ analog in claims 1-9.   There is also no infringement of claims 10-11 of the '980 patent under the doctrine of equivalents because Pentech's ANDA product does not contain an ingredient that could be considered equivalent to the "agent" required by claims 10-11.   Further, to find infringement would vitiate or effectively read out the "agent" claim limitation, in violation of the all elements rule.

Since there is no infringement, either literal or under the doctrine of equivalents, of the '980 patent claims, there is not inducement of or contributory infringement of the '980 patent claims should a third party use Pentech's ANDA product.

### THE '116 PATENT CLAIMS ARE INVALID AS OBVIOUS

The claims of the '116 patent are directed to methods for lowering or maintaining lowered serum parathyroid hormone in human patients suffering from hyperparathyroidism secondary to end stage renal disease based on a structural formula that includes specific analogs of vitamin $D_2$ or $D_4$.  The applications leading to the '116 patent that were filed prior to April 3, 1995 do not describe treatment of hyperparathyroidism of any kind, nor do they even mention hyperparathyroidism.   The disclosures of these applications cannot support the claims that have issued in the '116 patent.  Any publication of these applications is thus citable prior art with respect to the '116 patent claims.

U.S. Patent No. 5,104,864 ("the '864 patent"), which issued on April 14, 1992, is correctly characterized in the '116 patent at col.5, line 59, *et seq.* as disclosing that $1\alpha$-OH-$D_2$ has the same biopotency as $1\alpha$-OH-$D_3$, but is much less toxic. According to the '116 patent, the problem to be solved is the treatment of hyperparathyroidism with a compound that can be administered at an effective level without being toxic. Column 1, line 65, *et seq.* of the '116 patent states that the known treatment for this condition employs $1\alpha$-OH-$D_3$, and that the effective dosages are at a level that show undesirable toxicity. In an attempt to show patentability, the '116 patent notes at col. 5, line 45 that "[t]he medical community currently views vitamin $D_3$ compounds as biologically indistinguishable from the corresponding vitamin $D_2$ compounds." Applicants attribute to themselves the discovery, published in their earlier '864 patent, that vitamin $D_2$ analogs are substantially less toxic than vitamin $D_3$.

It is black letter law that a published patent application which does not support a descendant is citable as prior art with regard to that descendant. *In re Ruscetta*, 118 USPQ 101 (CCPA 1958). Thus, the '864 patent operates as prior art under 35 U.S.C. § 102(b). It is apparent from the admission that the problem to be solved in treating hyperparathyroidism using the known vitamin $D_3$ analog treatment is to use a less toxic compound in combination with the disclosure in the '864 patent that vitamin $D_2$ is substantially less toxic than vitamin $D_3$. This clearly suggests at least independent claims 1 and 9 of the '116 patent.

Claim 3 of the '116 patent mandates a dosage of 1-100 μg per week. The lower range, at least of this dosage, is suggested by the prior art cited in col. 2, lines 6-25 of the '116 patent, which indicates that the standard treatments with vitamin $D_3$ include dosages of 2 μg/day. If $D_2$ is, as acknowledged, comparably active but substantially less toxic, this leads to a dose of 14 μg/week. This is well within the range required by claim 3.

It clearly escaped both the patentee and the examiner that applicants' earlier issued application is citable as prior art against the '116 patent claims.

The relative lack of toxicity of $1\alpha$-hydroxy-$D_2$ as compared to $1\alpha$-hydroxy-$D_3$ is further verified by Sjödén, G., *et al., Acta Orthoped. Scandinav. Supp.* 217 (1985) 56:2-83. Page 60 states that in rats (stated to be analogous to humans on p. 56) $1\alpha$-hydroxy-$D_3$ was 5 to 15 times more toxic than $1\alpha$-hydroxy-$D_2$. It is also stated on page 62 that oral vitamin $D_2$ analogs may be safer than currently used vitamin $D_3$ preparations. Thus, Sjödén is cumulative to the disclosure of the '864 patent.

### The '116 Patent Claims are Obvious Over EP 503,630 and by Forte. L.R ., *et al.,* J. *Supramolecular Structure (1978)* 9: 179-188

The application that resulted in European Patent 503,630 B1 was published on September 16, 1992, three years prior to the relevant application date for the '116 patent. The focus of that application is derivatives of cyclohexanetriol (an analog of a component of the D vitamins). These derivatives are discussed as synthetic intermediates of dihydroxy-Vitamin $D_3$ and of "$1\alpha$-hydroxy-Vitamin D derivatives which are deemed effective for treating selected diseases of calcium metabolism, *e.g.,* chronic renal failure, hypoparathyroidism, *secondary hyperparathyroidism,* osteomalacia, and osteoporosis, such as $1\alpha$-hydroxy-Vitamin $D_3$, $1\alpha,25$-dihydroxy- Vitamin $D_3$, $1\alpha$-*hydroxy- Vitamin $D_2$,* and 24-epi-$1\alpha,25$-dihydroxy-Vitamin $D_2$ ... ."

17

This statement takes for granted that secondary hyperparathyroidism can be treated with $1\alpha$-hydroxy-Vitamin $D_2$.    This document was cited in the European counterpart of the '116 patent and was overcome on the ground that there is no anticipation in selecting individual items from each of two lists.    However, this does not overcome the fact that this document clearly teaches that $1\alpha$-hydroxy-Vitamin $D_2$ is a treatment for secondary hyperparathyroidism.    Thus, this European patent defeats the patentability of claims 1-2 and 7-9 of the '116 patent.

Similarly, the article by Forte *et al.* reports work with rats that were fed a diet deficient in vitamin D.    These rats exhibited calcium deficiency and secondary hyperparathyroidism.    The parathyroid hormone levels could be restored to normal levels by administering vitamin $D_2$. While not specific to the 1-hydroxy derivative, this article teaches that vitamin $D_2$ itself (and perhaps vitamin $D_2$ analogs) is useful in the treatment of hyperparathyroidism.    As the invention of the '116 patent resides in the substitution of $D_2$ analogs for $D_3$ analogs, this seems germane and strongly suggestive of the 1-hydroxy derivative.

EP 503,630 taken alone provides at least a *prima facie* basis to reject at least claims 1-2 and 7-9 of the '116 patent, and Forte taken alone points to the invention of these claims.    When taken in combination with, for example, Nishii *et al.* (U.S. Patent No. 5,063,221), which describes similar analogs for treatment of hyperparathyroidism, these references clearly suggest the above-mentioned claims.    The combination is suggested by the fact that these prior art references are concerned at least in part with the treatment of hyperparathyroidism.

Claims 1-2 and 7-9 of the '116 patent are invalid for obviousness in view of EP 503,630 and Forte, as well as Nishii.    Claims 3-6 represent routine optimization as further described below and do not add patentability to the claims.    Claims 3-6 are invalid for the same reasons that claims 1-2 and 7-9 are invalid.

### The '116 Patent Claims are Obvious Over the Nishii '221 Patent and the DeLuca '596 Patent, Alone or in Combination

The Nishii '221 patent was discussed in an interview during the prosecution of the '116 patent.    This patent is squarely directed to treatment for hyperparathyroidism by using vitamin D derivatives, the structures for which are provided in that patent.    Most of the specific structures are vitamin $D_3$ analogs that contain additional carbon atoms or hydroxylation.    In general, however, Nishii discloses $1\alpha$-hydroxy-D analog derivatives which contain a double bond in the substituent on the five-membered ring.    Thus, these compounds share the structure:

104568_1

where R is defined as a branched alkyl group having 4-6 carbon atoms that is substituted by one or two hydroxyl groups or a cyclopropylhydroxymethyl group.

The original '116 patent claims contained an embodiment that included this description. This overlap was eliminated by the requirement that appears in the '116 patent and its descendants that, in the formula provided (which is common to $D_2$ and $D_4$), when a double bond is present, the group does not contain an OH (specifically, $R_1$ is H). Since the original application in the '116 patent regarded the presence or absence of OH and H in position $R_1$ as substantially equivalent, it is clear that the specific compound 1$\alpha$-hydroxy-$D_2$ where $R_1$ is indeed H is merely an obvious alternative within the group of compounds suggested by Nishii. While it is certainly the case that the disclosure of a genus (such as that described by Nishii) does not render obvious a particular member of that genus, the genus here is sufficiently small that an individual member is fairly suggested.[3]

Thus, Nishii taken alone suggests the compounds of the claimed invention of the '116 patent, especially in view of the disclosure in Sjödén that it is well known that the D vitamins are 25-hydroxylated in the liver (*see* page 57) and that 1$\alpha$-hydroxy-Vitamin $D_2$ probably requires 25-hydroxylation before being active (*see* page 30). This underscores the equivalence of compounds wherein a position substituted by H is replaced by a position substituted by OH. One example is $R_1$ at position 24. Compounds where $R_1$ is OH are evidently conceded to be suggested by the disclosure of Nishii.

The claimed subject matter of the '116 patent claims is also made obvious by the disclosure of the DeLuca '596 patent, which specifically suggests the use of 1$\alpha$-hydroxy-ergocalciferol *(i.e.,* 1$\alpha$-hydroxy-Vitamin $D_2$) as improving the intestinal absorption of calcium as well as calcium balance. The relationship between calcium balance and hyperparathyroidism was well understood in the art in 1995, the application date of the '116 patent. This relationship is acknowledged by Nishii at col. 1, line 38, *et seq.*:

---

[3]    It is true that many of the specific embodiments suggested by Nishii are analogs to $D_3$, in view of their lack of methyl substituent at the position vinyl to the double bond; however, the embodiment (D) in column 3 does have a methyoxy substituent in this position.

In other words, PTH is secreted in response to the decrease in level of calcium in the blood ... . $l\alpha$-25-dihydroxy-Vitamin $D_3$ increases the blood calcium level, triggering a negative feedback system to reduce the secretion of PTH.

Thus, with the knowledge that 1-hydroxy-Vitamin $D_2$ enhances calcium levels and with the knowledge that at least one mechanism for decreasing PTH levels is to enhance calcium, a mechanism not excluded from the claims, DeLuca, especially in combination with Nishii, suggests the invention as claimed, at least claims 1-2 and 7-9 of the '116 patent.

Claims 3-6 are directed to dosage levels, formulations, and routes of administration, none of which are demonstrated in the '116 patent to be particularly or surprisingly effective. Such limitations reflect routine optimization and fail to confer patentability.

Secondary considerations of obviousness may be considered to assess the validity of a claim. Here there is such a strong showing of obviousness of the claims of the '116 patent that any evidence of secondary considerations are insufficient to overcome the obviousness of the '116 patent claims.

## The Claims of the '980 Patent are Invalid for Obviousness and Double Patenting Over the Issued Claims in the '116 Patent

As stated above, the claims of the '116 patent are directed to methods for lowering or maintaining lowered serum parathyroid hormone in human patients suffering from hyperparathyroidism secondary to end stage renal disease based on a structural formula that includes specific analogs of vitamin $D_2$ or $D_4$. Claims 10-11 of the '980 patent include all of the limitations of claim 1 of the '116 patent and further require co-administration of an additional agent that has the ability to reduce loss of bone mass or bone mineral. This further requirement does not constitute an inventive step and, therefore, claims 10-11 of the '980 patent are invalid for statutory double patenting.

It is noted that the subject matter of claims 10-11 of the '980 patent was subject to a restriction requirement in the original application for the '116 patent, thus reflecting the consideration of the PTO that this subject matter is separately patentable and, thus, presumably patentable over the subject matter issued in the '116 patent. However, this may be negated by the failure of the PTO to restrict these claims from claims 1-9 of the '980 patent, where claims 1-9 are directed to the administration of a single agent limited to vitamin $D_4$ analogs. There is no additional inventive step in requiring an additional agent be co-administered. (Typically, when such restriction requirements are made, it is for reasons relating to ease of examination because the level of support for such combinations is generally low, and thus issues are raised under 35 U.S.C. § 112, first paragraph.) Thus, the existence of the restriction requirement in the '116 patent that related to claims 10 and 11 of the '980 patent does not salvage these claims from invalidity for double patenting. *See Bristol-Myers Squibb Co. v. Pharmachemie B.V.*, 70 USPQ2d 1097 (Fed. Cir. 2004).

Further, claims 10-11 of the '980 patent are obvious for the same reasons that the '116 patent claims are obvious, as explained above.[4]

## CONCLUSION

For all of the foregoing reasons Pentech's ANDA product does not infringe the '083 patent claims and claims 10-11 of the '980 patent. In addition, the '116 patent claims are invalid for obviousness and claims 10-11 of the '980 patent are invalid for double patenting and obviousness.

Pentech believes that there may be other bases for the invalidity and/or unenforceability of the '116, '980 and '083 patents. Therefore, Pentech does not limit any support it may have for a claim of invalidity or unenforceability to those set forth herein. Furthermore, Pentech reserves the right to add other defenses and grounds of invalidity and unenforceability during potential litigation.

## OFFER OF CONFIDENTIAL ACCESS TO APPLICATION

Pursuant to 21 U.S.C. § 355(j)(5)(C), this notice letter includes an Offer of Confidential Access to Application. As required by § 355(j)(5)(C)(i)(III), Pentech offers to provide confidential access to certain information from its ANDA No. 90-040 for the sole and exclusive purpose of determining whether an infringement action referred to in § 355(j)(5)(B)(iii) can be brought.

Section 355(j)(5)(C)(i)(III) allows Pentech to impose restrictions "as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information." That provision also grants Pentech the right to redact its ANDA in response to a request for Confidential Access under this offer.

As permitted by statute, Pentech imposes the following terms and restrictions on its Offer of Confidential Access;

(1)     Pentech will permit confidential access to certain information from its proprietary ANDA No. 90-040 to attorneys from one outside law firm representing Genzyme Corporation ("Genzyme") provided, however, that such attorneys do not engage, formally or informally, in any patent prosecution for Genzyme or any FDA counseling, litigation or other work before FDA for Genzyme. Such information (hereinafter "Confidential Pentech Information") shall be marked with the legend "CONFIDENTIAL."

(2)     The attorneys from the outside law firm representing Genzyme shall not disclose any Confidential Pentech Information to any other person or entity, including Genzyme employees, outside scientific consultants, and/or other outside counsel retained by Genzyme,

---

[4]     Claims 1-9 of the '980 patent are not relevant here because they are directed to a vitamin $D_4$ analog which is not present in Pentech's ANDA product.

without the prior written consent of Pentech's outside litigation counsel, Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd.

(3)    As provided by § 355(j)(5)(C)(i)(III), Genzyme's outside law firm shall make use of the Confidential Pentech Information for the sole and exclusive purpose of determining whether an action referred to in § 355(j)(5)(B)(iii) can be brought and for no other purpose. By way of example only, the Confidential Pentech Information shall not be used to prepare or prosecute any future or pending patent application by Genzyme, in connection with any filing to or communication with FDA, or in connection with any filing to or communication with the United States Pharmacopeia. Genzyme's outside law firm agrees to take all measures necessary to prevent unauthorized disclosure or use of the Confidential Pentech Information, and that all Confidential Pentech Information shall be kept confidential and not disclosed in any manner inconsistent with this Offer of Confidential Access.

(4)    The Confidential Pentech Information disclosed is, and remains, the property of Pentech. By providing the Confidential Pentech Information, Pentech does not grant Genzyme and/or the outside law firm any interest in or license for the Confidential Pentech Information.

(5)    Genzyme's outside law firm shall, within thirty-five (35) days from the date that it first receives the Confidential Pentech Information, return to Pentech' outside litigation counsel, Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd., all Confidential Pentech Information and any copies thereof. Genzyme's outside law firm shall return to Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd. all Confidential Pentech Information before any infringement suit is filed by Genzyme, if it is commenced before this 35-day period expires. In the event that Genzyme opts to file suit, none of the information contained in or obtained from any Confidential Pentech Information that Pentech provides will be included in any publicly-available complaint or other pleading.

(6)    Nothing in this Offer of Confidential Access shall be construed as an admission by Pentech regarding the validity, enforceability, and/or infringement of any U.S. patent. Further, nothing herein shall be construed as an agreement or admission by Pentech with respect to the competency, relevance, or materiality of any such Confidential Pentech Information, document, or thing. The fact that Pentech provides Confidential Pentech Information upon request of Genzyme shall not be construed as an admission by Pentech that such Confidential Pentech Information is relevant to the disposition of any issue relating to any alleged infringement of the '116, '980 or '083 patents, or to the validity or enforceability of these patents.

(7)    The attorneys from Genzyme's outside law firm will acknowledge in writing their receipt of a copy of these terms and restrictions prior to production of any Confidential Pentech Information. Such written acknowledgement shall be provided to Pentech's outside litigation counsel, Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd.

(8)    This Offer of Confidential Access shall be governed by the laws of the Commonwealth of Pennsylvania.

22

Section 355(j)(5)(C)(i)(III) provides that any request for access that Genzyme makes under this Offer of Confidential Access "shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in (this) offer of confidential access" and that the "restrictions and other terms of (this) Offer of Confidential Access shall be considered the terms of an enforceable contract." Thus, to the extent that Genzyme requests access to Confidential Pentech Information, it necessarily accepts the terms and restrictions outlined above. Written notice requesting access under this Offer of Confidential Access should be made to:

> Robert S. Silver
> Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd
> 11th Floor, Seven Penn Center
> 1635 Market Street
> Philadelphia, PA 19103-2212
> (215) 567-2010
> rssilver@crbcp.com

By providing this Offer of Confidential Access to Application, Pentech maintains the right and ability to bring a Declaratory Judgment action under 28 U.S.C. §§ 2201 *et seq.*, pursuant to 21 U.S.C. § 355(j)(5)(C).

Receipt of this notice begins the forty-five (45) day period provided for in Section 505(j)(4)(B)(iii) of the Act. ANDA No. 90-040 will be amended with a copy of the return receipt for this notice, as required by 21 CFR § 314.95(e).

The following are authorized to accept service of process on our behalf.

> Robert S. Silver
> Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd.
> 11th Floor, Seven Penn Center
> 1635 Market Street
> Philadelphia, PA 19103-2212

Very truly yours,

By _James L. Kadow_

James L. Kadow
Vice President Regulatory Affairs
Pentech Pharmaceuticals, Inc.